UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CHEYLENNE GRIMES,

                Plaintiff,

-vs-                                                   Case No. 6:04-cv-991-Orl-JGG

JO ANNE B. BARNHART,
Commissioner of Social Security,

                Defendant.
_____/

## MEMORANDUM OF DECISION

      Plaintiff Cheylenne Grimes ["Grimes"] appeals to the district court from a final decision of

the Commissioner of Social Security [the "Commissioner"] denying her application for a period of

disability, disability insurance benefits, and supplemental security income.  R. 12.  For the reasons

set forth below, this case is **REMANDED** to the Commissioner.

**I.**      **PROCEDURAL HISTORY**

      On February 20, 2002, Grimes filed a claim for disability insurance benefits, claiming

disability as of November 30, 2001 due to depression, arthritis, chronic headaches, high blood

pressure and back pain.  R. 56, 112.  Her claims were denied initially, R. 41, and upon

reconsideration, R. 37.  On October 2, 2003, the Honorable James R. Ciaravino, Administrative

Law Judge ["ALJ"], held a hearing on Grimes' claim in Orlando, Florida.  R. 394 - 474.  Attorney

James Keeter represented Grimes at the hearing.  R. 396.  The ALJ heard testimony from Grimes, her friend Judith Shealey, and Susanna D. Roche, an impartial vocational expert ["VE"].

On January 17, 2004, the ALJ issued his decision that Grimes was not entitled to benefits. R. 25.  Following a review of the medical and other record evidence, the ALJ found that Grimes could not perform any of her past relevant work.  R. 24, Finding 8.  However, the ALJ found that Grimes retained the residual functional capacity to perform a significant range of the physical exertional requirements of sedentary work.  R. 25, Finding 12.  The ALJ solicited testimony from the VE, who opined that a claimant of Grimes' age, education, past relevant work experience and RFC  could perform several unskilled sedentary jobs that existed in significant numbers in the local and national economies, including surveillance system monitor, food and beverage order clerk, addressor, and lamp shade assembler.  R. 23.  As such, the ALJ concluded that Grimes was not disabled.  R. 25, Findings 13 - 14.

On April 30, 2004, the Appeals Council denied review.  R. 2.  On June 30, 2004, Grimes timely appealed the Appeals Council's decision to deny review to the United States District Court. Docket No. 1.  On November 22, 2004, Grimes filed a memorandum of law in support of her appeal of the denial of review.  Docket No. 13.  On January 21, 2005, the Commissioner filed a memorandum in support of her decision that Grimes was not disabled.  Docket No. 14.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Grimes assigns three errors to the Commissioner.  First, she claims that the Commissioner erred in failing to obtain a consultative examination and Psychiatric Review Technique Form

["PRTF"] to determine whether she suffered from a somatic pain disorder.  Second, she claims

that the Commissioner erred by failing to consider whether her combined psychological and

physical problems could cause or contribute to her chronic pain complaints.  Third, Grimes claims

that the Commissioner erred in giving greater weight to the opinion of a consultant and lesser

weight to the opinion of one of her treating physicians.

     The Commissioner argues that substantial evidence supports her decision to deny

disability.  First, the Commissioner argues that no physician ever diagnosed Grimes with a

somatoform disorder.  Docket No. 14 at 10.  Second, the Commissioner argues that the evidence

shows that Grimes had the capacity to work, but chose not to do so.  Docket No. 14 at 11.  Third,

the Commissioner argues that the record supports the ALJ's decision to give less weight to

Grimes' treating physician, Dr. Gray, and give great weight to the opinion of a consulting

physician, Dr. Sheikh.  Docket No. 14 at 12.

## III.   THE STANDARD OF REVIEW

### A.   Affirmance

     The Commissioner's findings of fact are conclusive if supported by substantial evidence.

42 U.S.C. § 405 (g).  Substantial evidence is more than a scintilla — i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v.*

*Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th

Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937

F.2d 580, 584 n.3 (11th Cir. 1991).

-3-

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

**B.     Reversal and Remand**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).

-4-

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision.  *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g). To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[1] *Id.*

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

---

[1]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423 (d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.    <u>Treating Physicians</u>

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*,  955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion

does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527 (d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527 (e).   The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the province of the Commissioner.  20 C.F.R. § 404.1527 (e).

### B.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§

406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a

claimant has waived the right to retained counsel, and even if the claimant is represented by

counsel.  *See Cowart*, 662 F.2d at 735 - 36.  However, where an unrepresented claimant has not

waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to

a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v.*

*Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to

"scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and

to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances

are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### C.   Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's

medical sources do not give sufficient medical evidence about an impairment to determine

whether the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d 143,

146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required

to order a consultative examination unless the record establishes that such an examination is

necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206,

1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order

such an evaluation may be reversible error).  Under the regulations, however, the ALJ may

determine that a consultative examination or other medical tests are necessary.  20 C.F.R. §

416.917 (1998).

**D.**    **The Five Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§

404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not

disabled.  20 C.F.R. § 404.1520 (b).  Second, if a claimant does not have any impairment or

combination of impairments which significantly limit his or her physical or mental ability to do

basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. §

404.1520 (c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520 (d).  Fourth, if a

claimant's impairments do not prevent him or her from doing past relevant work, she is not

disabled.  20 C.F.R. § 404.1520 (e).  Fifth, if a claimant's impairments (considering his or her

residual functional capacity, age, education, and past work) prevent him or her from doing other

work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520 (f).

In determining whether a claimant's physical and mental impairments are sufficiently

severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must

consider any medically severe combination of impairments throughout the disability determination

process.  42 U.S.C. § 423 (d)(2)(B).  The ALJ must evaluate a disability claimant as a whole

person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v.*

*Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make specific and well-

articulated findings as to the effect of a combination of impairments when determining whether an

individual is disabled.  *See id.*, 985 F.2d at 534.

-10-

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416 (i)(3); 423(a), (c). If a claimant becomes disabled after the claimant has lost insured status, his or her claim for disability benefits must be denied despite the disability. *See, e. g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### E.   The Evaluation of Mental Disorders

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work. The listings for mental disorders are arranged in nine diagnostic categories. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work. A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526. An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity. The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment. Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning; concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work). A "marked" degree of limitation means more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical

-12-

sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning;  concentration, persistence and pace;  or ability to tolerate increased mental demands (stress).  This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination

of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not adequately describe these individuals' sustained ability to function.  It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

The Listing for Affective Disorders is as follows:

**12.04** **Affective Disorders**:  Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life;  it generally involves either depression or elation.
The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
A.      Medically documented persistence, either continuous or intermittent, of one of the following:
        1. Depressive syndrome characterized by at least four of the following:
            a. Anhedonia or pervasive loss of interest in almost all activities;  or
            b. Appetite disturbance with change in weight;  or
            c. Sleep disturbance;  or
            d. Psychomotor agitation or retardation;  or
            e. Decreased energy;  or
            f. Feelings of guilt or worthlessness;  or
            g. Difficulty concentrating or thinking;  or
            h. Thoughts of suicide;  or
            i. Hallucinations, delusions or paranoid thinking;  or

        2. Manic syndrome characterized by at least three of the following:
            a. Hyperactivity;  or
            b. Pressure of speech;  or
            c. Flight of ideas;  or
            d. Inflated self-esteem;  or
            e. Decreased need for sleep;  or
            f. Easy distractibility;  or

-15-

g. Involvement in activities that have a high probability of painful consequences which are not recognized;  or

h. Hallucinations, delusions or paranoid thinking;  or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
AND

B.      Resulting in at least two of the following:

1. Marked restriction of activities of daily living;  or

2. Marked difficulties in maintaining social functioning;  or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. Pt. 404, Subpt. P, App. 1.

An individual may meet the separate Listing for mental retardation if he or she meets the diagnostic description for mental retardation, has a valid verbal, performance, or full scale IQ of 60 through 70, and has a physical or other mental impairment imposing additional and significant work- related limitation of function.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

## F.    Other Work

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through

-16-

exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an

exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P,

Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983)

(exclusive reliance on the grids is appropriate in cases involving only exertional impairments,

impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full

range of work at a given residual functional level or when a claimant has a non-exertional

impairment that significantly limits basic work skills."  *Walker v. Bowen*, 826 F.2d 996, 1002-03

(11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only through

the use of a vocational expert.  *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th

Cir. 1986); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-

exertional limitations are alleged, the preferred method of demonstrating that the claimant can

perform specific work is through the testimony of a vocational expert).  It is only when the

claimant can clearly do unlimited types of work at a given residual functional level that it is

unnecessary to call a vocational expert to establish whether the claimant can perform work which

exists in the national economy.  *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989);

*Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a

specific finding as to whether the non-exertional limitations are severe enough to preclude a wide

range of employment at the given work capacity level indicated by the exertional limitations.

*Foote*, 67 F.3d at 1559.

1.      **Pain**

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress

has determined that a claimant will not be considered disabled unless he furnishes medical and

other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical

impairment which could reasonably be expected to produce the pain or symptoms alleged.  42

U.S.C. § 423 (d)(5)(A).  The ALJ must consider all of a claimant's statements about his

symptoms, including pain, and determine the extent to which the symptoms can reasonably be

accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1529.  In

determining whether the medical signs and laboratory findings show medical impairments which

reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh

Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and
> either (2) objective medical evidence that confirms the severity of the alleged pain
> arising from that condition or (3) that the objectively determined medical condition
> is of such a severity that it can be reasonably expected to give rise to the alleged
> pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain

alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v.*

*Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not,

by itself, conclusive of disability.  42 U.S.C. § 423 (d)(5)(A).

2.      **Credibility**

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must

articulate specific and adequate reasons for doing so, or the record must be obvious as to the

credibility finding.  *Foote,* 67 F.3d at 1561-62*; Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

V.      **APPLICATION AND ANALYSIS**

A.      **The Facts**

In 1991, as noted by psychiatrist Martin S. Kane, M.D. in his report of May 4, 1995,

Grimes was hospitalized twice at the University Behavioral Center (UBC)[2] under the care of Dr.

Sandar Aziz for psychological problems related to agoraphobia, panic attacks, schizoaffective

disorder and manic depression.[3]  R. 131.  On June 4, 1992, Dr. Aziz had noted that Grimes

complained of pain in her pelvic area and of family problems.  R. 143.  On August 26, 1992, Dr.

Aziz noted that she was tearful and continued to have family problems (her husband and son left

---

[2]The UBC medical records [R. 177-190] cover the period of October 10, 1991 through March 20, 2002.  In the UBC initial psychiatric assessment of October 10, 1991, Dr. Aziz noted Grimes' prior anxiety, and noted that she had brought a bottle of lithium to her appointment even though she had not taken lithium since 1987.  R. 188  Dr. Aziz noted that Grimes stated that she was getting into spirituality, and that "it was very difficult for her to talk about [spirituality] because she believes psychiatrists are not spiritual"; she stated that she believed she was possessed by demons; that she saw herself walking through walls; that she believed she has been put on a cross; and she had suicidal ideation.  R. 188.  On July 11, 1992, Grimes had a Global Assessment of Functioning [DSM-IV] score of 20 - 30 and was hospitalized.  R. 186.  She was discharged on July 21, 1992, at which time Dr. Aziz noted that she had stabilized on Prolixin, Doxepin, and Artane with severe psychotic symptoms and a current GAF score of 25.  R. 183 - 84.  On March 20, 2002, she underwent another intake evaluation at UBC for depression, inability to keep jobs (e.g., could not arrive on time, maintain pace), and stress.  R. 177.  She was diagnosed with a GAF score of 60, associated with a major depressive disorder, recurrent and moderate.  R. 180.

[3]Dr. Kane treated Grimes for slightly more than a month.  In his initial psychiatric assessment dated May 4, 1995, he noted that Grimes saw no further psychiatrists after 1991, and had no further psychotropic medications until April 1994, when she was placed on Paxil.  R. 131.  However, he questioned her compliance with treatment.  R. 131.  Dr. Kane initially determined her GAF score as 50; he stated that she had two unintelligible utterances during the initial interview.  R. 131.  On May 12, 1995, Dr. Kane diagnosed her with probable schizoaffective disorder; he noted another episode of her uttering "unintelligible gibberish"; he prescribed Perphenazine for severe agitation, to be taken with the other medications (e.g., Serzone; Buspar); and he cleared her for a return to work on 5/29/95.  R. 129.  However, on May 30, 1995, Grimes reported not going to work because she "felt as if there was a hose sucking all her energy out of her"; she had stopped taking Serzone four days prior to her return to work, as well as the Perphenzine.  R. 128.  By June 6, 1995, Dr. Kane had diagnosed her with schizoaffective disorder; he noted that she called his office "somewhat hysterical in crisis"; and he also noted that she did not like taking medications.  R. 127.

her and her daughter was "acting out"). R. 143. On September 21, 1992, he noted that Grimes complained of increased anxiety, and he continued her prescription medications.[4] R. 142.

From January 29, 1999 through May 5, 1999, Grimes was treated by Dr. Michael McHale for pain associated with polyarthralgias. R. 132 - 37. She complained of arthritis pain to her arms and legs and to otherwise chronic muscle and joint aches. R. 134 - 137. Also, during her treatment with Dr. McHale, she underwent an arthritis evaluation by Javaid Sheikh, M.D. at the Orlando Arthritis Institute.[5] On May 7, 1999, Dr. Sheikh wrote to Dr. McHale and stated that Grimes may have inflammatory myositis, but required additional testing. R. 235. On May 20, 1999, Dr. Sheikh again wrote to Dr. McHale and noted his impression that Grimes had a likely diagnosis of fibromyalgia after the lab results had been analyzed. R. 233. In his letter of June 24, 1999, Dr. Sheikh mentioned that "the most likely diagnosis [of her pain complaints] is fibromyalgia *associated with exaggerated pain behavior*" (emphasis added). R. 232. Grimes returned to the Orlando Arthritis Institute again on June 5, 2002 for a rheumatological examination upon a referral from Keith A. Gray, M.D., who was treating her left knee pain and other complaints at that. R. 228.

---

[4]Dr. Aziz continued to treat Grimes over the years. On November 11, 1997, he noted her schizoaffective disorder, her continued family stress (e.g., her husband was dying of HIV-related disease), and her problems at work related to her inability to keep up with the pace of work. R. 141. On January 25, 2000, Dr. Aziz noted that Grimes was "Baker Acted" at Lakeside Alternatives; that she had continued problems with anxiety; and that she is socially isolated. R. 141. On September 12, 2000, she complained to him that "I feel like I am going to have a breakdown"; that she was sleeping in her car and taking showers at her friend's house; and that she quit working at J.C. Penny but found a new job. R. 140.

[5]Dr. Sheikh also referred Grimes for a pain management evaluation to the Rehabilitation Medical Group (RMG). On May 18, 1999, the RMG wrote to Dr. Sheikh about nerve conduction studies and needle electromyogram studies that were conducted. The test results indicated no electrodiagnostic evidence of inflammatory myositis or peripheral neuropathy. R. 323 - 25.

-21-

Grimes sought treatment from Maris G. Ramsey, D.O. from June 9, 2000 through January 11, 2001.  R. 147 - 48.  Dr. Ramsey noted her complaints of headaches, but commented that it should be determined whether or not they were psychological.  R. 148.  On October 1, 2000, Grimes underwent a dual isotope stress test at Florida Hospital for complaints of chest pain.  R. 138.  The results were normal.  R. 139.  Dr. Ramsey further noted her tearfulness and increased stress; he noted a continued complaint of chest pain on January 11, 2001.  R. 147.

On July 25, 2001, Grimes again complained of chest pain after six days of discomfort.  R. 151.  She was admitted to Orlando Regional Medical Center ["ORMC"] for a cardiology workup.  R. 153.  Jose LeFran, M.D. noted that she had been doing some heavy lifting at work, and was under a worker's compensation leave of absence for a low back pull.  R. 154.  The thallium stress test and myocardial perfusion scan indicated no abnormalities.  R. 158.  Grimes was prescribed Vasotec, discharged, and advised to follow up with Dr. Mary Joseph.  R. 170.

However, on August 1, 2001, Grimes started treatment with Dr. Keith A. Gray.[6]  R. 203 - 13.  He noted that she had been taking Remeron, that she had not taken it for the past month; and that she was under a lot of pressure at home and at work.  R. 213.  By August 23, 2001, Dr. Gray noted her recurrent headaches, dizziness, nausea, and vomiting.  R. 212.  On November 20, 2001, which was about the time that Grimes lost her retailing job at Zion's Hope, Dr. Gray scheduled her for an injection in her left knee for chronic pain.  R. 210.  On February 12, 2002, Dr. Gray noted that she continued to have left knee discomfort; that she had lost her job and had also lost several other jobs over the last few years; that she had daily headaches and excessive sleepiness related to

---

[6]Dr. Gray had assessed Grimes on June 11, 1999, and concluded that her multiple pain complaints were likely attributable to fibromyalgia.  R. 208.

medications; and was under a great deal of stress.  R. 205.  By March 6, 2002, he had scheduled

her for physical therapy related to cervical and lumbar spondylosis.[7]  R. 202.

On March 6, 2002, Grimes commenced treatment with CORA Rehabilitation Clinics.  R.

191 - 201.  This therapy lasted less than one month.  The initial PT evaluation stated that she had

difficulty with walking, squatting and standing.  R. 201.  Her plan of care consisted of therapeutic

exercises, various modalities, and body mechanics instruction.  R. 201.  At the conclusion of PT,

she was still noted to have an antalgic gait involving her lower left extremity.  R. 190.

On June 3, 2002, a Physical Residual Functional Capacity Assessment (RFC) form was

completed by M. delaCerna, M.D., a non-examining medical reviewer. R. 220 - 27.  He noted,

*inter alia*, that Grimes' right knee was normal and that her left knee showed minimal

osteoarthritis.  R. 222.  He further noted that Grimes' symptoms were "consistent and credible

with mild osteoarthritis of the cervical spine and left knee; should not preclude her with doing this

RFC [light]."  R. 225.  Dr. delaCerna did not review any treating or examining source statements

in connection with his review.  R. 226.

On  June 18, 2002, William W. Austin, Psy.D., conducted a consultative mental status

examination of Grimes.  Dr. Austin did not indicate whether he had reviewed any of Grimes'

mental health records. Also, Dr. Austin did not conduct any psychological testing.  Further, Dr.

Austin did not make any reference in his report concerning whether Grimes had any signs or

symptoms of a somatoform or psychogenic pain disorder, nor did he report her GAF scores.  Dr.

---

[7]Dr. Gray additionally treated Grimes on June 14, 2002, June 25, 2002, July 31, 2002, and October 1, 2002. R. 345 - 48.  In his notes of June 14, 2002, Dr. Gray noted Grimes described "excruciating left knee pain . . . [and] pain in the popliteal region."  R. 348.  On June 25, 2002, Dr. Gray prescribed a cane.  R. 347.  On October 1, 2002, Dr. Gray noted Grimes' previous hospitalization for suicidal thoughts or ideations.  R. 345.

Austin described Grimes' speech as logical and coherent, said she did not demonstrate any overt symptoms of psychosis such as hallucinations or delusions, said her though processes were linear and described her mood as "depressed."  He considered her judgment, impulse control and insight good.  R. 243 - 45.

On July 6, 2002, Deborah L. Carter, Ph.D., completed a Mental Residual Functional Capacity Assessment ["MRFC"] and a PRTF.  R. 246 - 49; 250 - 63.  Dr. Carter determined that Grimes suffered from "moderate" limitations in her ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to set realistic goals or make plans independently of others. R. 246 - 47.  Dr. Carter also noted in the PRT that Grimes had history of schizophrenia, an anxiety-related disorder, and an affective disorder, but made no mention of any somatoform (Listing 12.07) disorders.  R. 256.

On September 12, 2002, Grimes entered Florida Hospital for psychiatric treatment related to recurrent major depression, posttraumatic stress disorder (PTSD), chronic pain, and other medical concerns.[8]  R. 264-279.  She had been brought to the hospital by her daughter because she had been "screaming and hollering at home."  R. 277.  The History and Physical noted that "the

---

[8] Before her admission to Florida Hospital on September 12, 2002, Grimes had been under psychological care with Doris M. Campbell, Psy.D., who noted on September 10, 2002 that Grimes "was so agitated that she said that she feared for her own life or that she might take someone else's life. Amenable to my suggestion that she might wish to be evaluated at the hospital.  Called the hospital and was told for her to come to E.R."  R. 279.

patient has not been able to get disability or Medicaid and has not been able to afford her

medications.  She has been moving from home to home in her family network.  She has become

increasingly depressed, despondent, hopeless, and suicidal." R. 269.  Upon her discharge on

September 18, 2002, Grimes was taking Seroquel; Paxil CR; Skelaxin; Duragesic patch; Lidoderm

patch, 5 percent (left knee); Tiazac; Premarin; and Diovan.  R. 264.  She was also determined to

have a GAF score of 25 at the time of discharge.  R. 264.

Just prior to and after her psychiatric hospitalization on September 12, 2002, Grimes saw

an orthopedist, Norton M. Baker, M.D., for chronic pain.  R. 280 - 87.  On July 15, 2002, Dr.

Baker noted "significant crepitation" with Grade I effusion in her left knee.  R. 286.  He injected

her knee with Dalalone and Xylocaine.  R. 286.  On July 29, 2002, Dr. Baker noted the injections

had only helped for a day or two; he wanted her off of her feet and prescribed crutches.  R. 285.

An MRI dated August 7, 2002, interpreted by Dr. David S. Williams, noted "marked

osteoarthritis" with "severe loss of articular cartilage" in her left knee.  R. 287.  On September 4,

2002, Dr. Baker noted that Grimes "is in a lot of pain."  R. 283.  Grimes' final treatment with Dr.

Baker was on September 30, 2002, at which time he noted that "she's obviously very sick . . .

looks poorly . . . she's nauseated . . . ."  R. 280.

On October 23, 2002, Dr. Keith Holden completed a Physical Residual Functional

Capacity Assessment.  Unlike the prior nonexamining reviewers, Dr. Holden did mention Grimes'

"exaggerated pain behavior" associated with the physical symptoms of fibromyalgia.  R. 289.

However, Dr. Holden made no assessment of the mental impairment that may have been

associated with Grimes' exaggerated pain behavior and concluded that "the severity of [her signs

and symptoms are] are only partially credible." R. 293. Dr. Holden based his credibility

assessment on several factors, including Grimes' good range of motion. R. 293.

On November 15, 2002, Grimes returned to the Rehabilitation Medical Group and Dr.

Diana Harper for chronic pain treatment. R. 319. Dr. Harper noted that Grimes' "pain has become

so severe that it dominates her life. She has been unable to work for the past year, and was

actually admitted to a medical psychiatric unit in September 2002 secondary to severe depression

regarding her chronic pain." R. 319. Further, Dr. Harper noted that "[Grimes] continues to have

significant difficulty with fine motor skills with fatigue and achiness in her hands, left greater than

right, and continues to have severe pain, as above, limiting every aspect of her life, including her

mobility and endurance with ADL's. She is currently intermittently using crutches or a cane for

ambulation, depending on how she is feeling that day." R. 319. Dr. Harper prescribed a trial of

the medications Anexsia, Bextra, and Neurontin, aquatic therapy, and a lumbar spine MRI. R. 321

- 22. On December 3, 2002, Dr. Harper noted continued chronic pain syndrome with particular

note of Grimes' lower left extremity pain. R. 318.

On January 10, 2003, Jeffrey L. Prickett, Psy.D., completed a PRTF. R. 296 - 309. Dr.

Prickett stated that Grimes had not been hospitalized since 1992, when she was hospitalized for a

schizoaffective disorder. R. 308. However, Dr. Prickett did not mention that on January 25, 2000,

Dr. Aziz noted that Grimes was "Baker Acted" at Lakeside Alternatives; that she had continued

problems with anxiety; and that she is socially isolated. R. 141. Nor did Dr. Prickett mention that

Grimes was in the hospital for five days in June 2002 related to nausea, vomiting and pain. R.

332. Nor did Dr. Prickett mention Grimes' prior hospitalizations for cardiac workups related to

-26-

chest pains.  Dr. Prickett also did not indicate note any evidence of a somatoform disorder.  R.

302.

On January 24, 2003, Dr. Harper noted a lumbar spine MRI result from December 6, 2002

that indicated a "broad based disc protrusion on the right neural foramina, L3-4, causing right

foraminal stenosis but no central canal stenosis identified."  R. 317.  Also, on January 24, 2003,

Dr. Harper wrote the following on a blank prescription form:  "Patient unable to work since Dec.

2001 and cont. out of work @ this time underlinedindefinitely."  R. 336 (emphasis in original).  On March

13, 2003, Grimes again saw Dr. Harper, who noted that Grimes continued to experience chronic

pain.  Dr. Harper recommended continued use of Bextra, Neurontin, and MS Contin for pain

control, as well as a continued home exercise program.[9]  R. 315.

On March 11, 2003, Grimes returned to Dr. Gray.  R. 331.  He noted that she had some

nausea and occasional vomiting. R. 331.  His impression of her condition included fibromyalgia

and depression.  R. 331.  On July 1, 2003, Dr. Gray noted her continued headaches and dizziness;

that she said her headaches were at times unbearable; that she felt as though there were an

explosion in her head; and that she was taking morphine three times per day.  R. 328.  Dr. Gray

further noted that she was living in a women's shelter at that time.  R. 328.  He directed her to

follow up with pain management and her psychiatrist.  R. 329.  On August 14, 2003, Dr. Gray

noted her "continued severe generalized aches and pains, which is out of proportion to clinical

_____

[9]Dr. Harper saw Grimes again on September 19, 2002, at which time she noted that Grimes was in the hospital for 5 days in June 2002 related to nausea, vomiting and pain; that she was returning to Dr. Harper's office for pain management because Dr. Gray did not plan on giving her any pain medications in the future; that she continues to have 8 out of 10 pain; and that she was not able to do the home exercise program because "it hurts too much."  R. 332. Dr. Harper recommended discontinuance of the Duragesic, but continued use of Skelaxin and a trial of Celebrex.  No new pain medications would be prescribed until a release letter from Dr. Gray was obtained.  R. 333 - 34.

findings."  R. 327.  Dr. Gray also noted that Grimes had not yet followed up with pain management.  R. 327.  He told her that he would not refill her morphine prescription at that time. R. 327.

On August 20, 2003, Dr. Gray again noted "generalized pain. Etiology unclear. This is either psychogenic or due to fibromyalgia."  R. 326.  He referred her to psychiatry and noted that she had an appointment to see pain management on October 30, 2003.  R. 326.  Though Grimes requested morphine, Dr. Gray told her that she would not be given it in addition to her other narcotic analgesics.  R. 326.  Also, Dr. Gray wrote on a prescription pad "To Whom it May Concern:  Ms. Cheylenne Grimes has not worked for one and a half years and it is unlikely that she will be able to work for the foreseeable future."  R. 335.

At the hearing conducted on October 2, 2003, Grimes testified at length regarding her pain complaints.  She stated that she has had pain from her thighs down for approximately 18 months, R. 430; that her doctors have told her that she has fibromyalgia and a pinched nerve, R. 433; that she is often "grimacing in pain" R. 438; that she is not functional and is not able to do anything but sit down after taking lithium, R. 442; that she is pain free on 1 or 2 days per week, R. 445; that her legs are "dead" when she wakes up in the morning, so she uses a cane, R. 445; and that on some mornings somebody has to come and flip her over and someone has to come in and pull her up and help her get up, R. 446.

**B.**     **The Analysis**

Grimes first argues that the ALJ erred by failing to order a psychiatric consultative exam to assess whether Grimes had a somatic pain disorder or somatoform disorder in light of her treating physicians' reference to exaggerated pain behavior and a likely psychogenic pain disorder.  Docket No. 13 at 16.  In support of her contention, Grimes points out that the consultative psychological exam by Dr. Austin and the PRT forms relied upon by the ALJ failed to address the possibility that she suffered such a disorder, and Grimes contends that the ALJ therefore lacked sufficient evidence to reach a conclusion on this point.  Docket No. 13 at 16 - 17.  Grimes is wrong.

When the record contains a diagnosis of a particular condition, the ALJ must properly consider it.  *Vega v. Comm'r*, 265 F.3d 1214, 1219 (11th Cir. 2001).  However, the ALJ is not required to make such a diagnosis himself.  Grimes is unable to point to any physician who ever squarely diagnosed her with a somatoform disorder.  As Grimes points out, Dr. Gray did describe Grimes as suffering pain that was "out of proportion to clinical findings" [R. 327], and as suffering "generalized pain" that was "either psychogenic or due to fibromyalgia."  R. 326.  Dr. Gray did opine that Grimes was unlikely to be able to work for the foreseeable future.  R. 335.  Dr. Harper noted that Grimes' pain had become so severe "that it dominates her life," and that Grimes had been admitted to a medical psychiatric unit "secondary to severe depression regarding her chronic pain."  R. 319.  Dr. Ramsey commented that it should be determined whether or not

Grimes's headaches were psychological.  R. 148.  Although these descriptions seem consistent

with a somatoform disorder,[10] they do not carry the strength of a medical diagnosis.

    Further, the Court notes that Keith A. Gray, M.D. — who might be said to have made a

general "differential diagnosis" that Grimes' pain was either psychogenic or due to fibromyalgia,

R. 326 — in fact resolved the diagnosis in favor of fibromyalgia, R. 232.  Thus it would appear

that Dr. Gray disfavored somatoform disorder as a final diagnosis.  In any event, Grimes has failed

to demonstrate that an additional consultative examination was necessary to enable the ALJ to

render an informed decision.

    Grimes' second argument is that the ALJ failed to adequately consider whether her chronic

pain resulted from her combined psychological and physical impairments.[11]  Docket No. 13 at 19 -

20.  Over several years, treating physicians diagnosed Grimes with major depressive disorder,

recurrent and moderate (also referred to as recurrent major depression);[12] schizophrenia;

schizoaffective disorder; manic depression; major psychotic symptoms;  agoraphobia; panic

---

[10]The common feature of the Somatoform Disorders is the presence of physical symptoms that suggest a general medical condition, and are not fully explained by a general medical condition, by the direct effects of a substance or by another mental disorder (e.g., Panic Disorder).  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS [DSM-IV] 445 (4th ed. 1994).  Accordingly, a diagnosis or somatoform disorder would be inappropriate if Grimes's symptoms and limitations were fully explained by her other various mental disorders or general medical condition.

[11]The Court need not address Grimes's subsidiary argument that "the ALJ failed to consider and discuss additional medical evidence of [my] apparent somatoform impairment."  Docket No. 13 at 19.  As noted above, no physician actually diagnosed her as suffering from a somatoform disorder.

[12]The diagnosis is described in the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"].  The diagnostic criteria for DSM-IV 296.3 Major Depressive Disorder, Recurrent, are the presence of two or more major depressive episodes including: depressed mood most of the day, nearly every day; markedly diminished interest or pleasure in all, or almost all activities most of the day, nearly every day; significant weight loss; insomnia or hypersomnia nearly every day; psychomotor agitation or retardation nearly every day; fatigue or loss of energy nearly every day;  feelings of worthlessness or excessive or inappropriate guilt nearly every day; diminished ability to think or concentrate, or indecisiveness, nearly every day; recurrent suicidal ideation.

attacks; anxiety with social isolation; and posttraumatic stress disorder (PTSD).[13]  Grimes argues

that ALJ erred in determining that her underlying psychiatric condition was of not so severe that it

could be reasonably expected to give rise to the pain and limitations alleged.

Grimes is correct that the ALJ erred in giving insufficient weight to the opinions of Keith

A. Gray, M.D., Grimes's treating physician.  Docket No. 13 at 20 - 21.  The ALJ must give

substantial weight to Dr. Gray's opinion, diagnosis and medical evidence unless there is good

cause to do otherwise.  If Dr. Gray's opinion on the nature and severity of Grimes's impairments is

well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not

inconsistent with the other substantial evidence in the record, the ALJ must give it controlling

weight.  The ALJ may discount Dr. Gray's opinion or report regarding an inability to work if it is

---

[13]DSM-IV 309.81provides the diagnostic criteria for "Posttraumatic Stress Disorder".  DSM-IV at 427.  The diagnosis requires exposure to a traumatic event in which both of the following were present: (1) the person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of others, and (2) the person's response involved intense fear, helplessness, or horror.  The traumatic event must be persistently reexperienced in one (or more) of the following ways: (1) recurrent and distressing recollections of the event, including images, thoughts, or perceptions; (2) recurrent distressing dreams of the event; (3) acting or feeling as if the traumatic event were recurring (includes a sense of reliving the experience, illusions, hallucinations, and dissociative flashback episodes, including those that occur on awakening or when intoxicated); (4) intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event; (5) physiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event.  The patient must persistently avoid stimuli associated with the trauma and experience numbing of general responsiveness (not present before the trauma), as indicated by three or more of the following: (1) efforts to avoid thoughts, feelings, or conversations associated with the trauma; (2) efforts to avoid activities, places, or people that arouse recollections of the trauma; (3) inability to recall an important aspect of the trauma; (4) markedly diminished interest or participation in significant activities; (5) feeling of detachment or estrangement from others; (6) restricted range of affect (e.g., unable to have loving feelings); (7) sense of a foreshortened future (e.g., does not expect to have a career, marriage, children, or a normal life span).  The patient must also experience persistent symptoms of increased arousal (not present before the  trauma), as indicated by two (or more) of the following: (1) difficulty falling or staying asleep; (2) irritability or outbursts of anger; (3) difficulty concentrating; (4) hypervigilance; (5) exaggerated startle response.  The duration of the disturbing symptoms must exceed one month.  And the disturbing symptoms must cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.  Examiners should specify whether the disorder is "acute" — with symptom duration of less than three months — or "chronic" — with symptom duration of three months or more.  Examiners should also specify if the disorder is "with delayed onset" — if the onset of symptoms occurs at least six months after the stressor.

unsupported by objective medical evidence or is wholly conclusory.[14]  As a treating physician, Dr.

Gray's opinions are generally entitled to more weight than those of a consulting physician, except

when determining Grimes's RFC because that ultimate determination is the province of the

Commissioner.

      Dr. Gray expressed many diagnoses and opinions, none of which are wholly conclusory.

On March 11, 1003, Dr. Gray examined Grimes and diagnosed nausea and vomiting, hypertension,

fibromyalgia, depression, history of internal knee derangement, and history of headaches.  R. 331.

On April 15, 2003, Dr. Gray examined Grimes and diagnosed hypertension, fibromyalgia,

depression, history of internal knee derangement, and history of chronic headaches.  R. 330.  On

July 1, 2003, Dr. Gray examined Grimes and diagnosed hypertension, fibromyalgia, depression

and anxiety, history of internal knee derangement, chronic headaches, and nonspecific

disequilibrium.  R. 329. On August 14, 2003, Dr. Gray examined Grimes and diagnosed continued

severe generalized aches and pains out of proportion to clinical findings; hypertension,

fibromyalgia, anxiety and depression, chronic headaches, and possible substance dependency.  R.

327. On August 20, 2003, Dr. Gray examined Grimes and diagnosed continued generalized pain of

unclear etiology, either psychogenic or due to fibromyalgia; depression and anxiety, history of

vascular headaches, possible syncopal episodes, and history of knee derangement.  R. 326. On

January 24, 2003, Dr. Gray opined that Grimes was unlikely to be able to work for "the

foreseeable future."  R. 335, *accord*, R. 336 (similar opinion of Diana Harper, M.D.).

---

[14]Even if Dr. Gray's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh his opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.

The ALJ stated his reasons for giving Dr. Gray's opinions "less weight":

The undersigned finds, however, that Dr. Gray is a generalist and not a specialist in musculoskeletal problems.  Further, Dr. Gray failed to provide relevant evidence to support his opinion and the opinion is inconsistent with the record as whole with the exception of marked left knee arthritis by MRI, treated with Synvise injected with good functional results, most of the objective tests have been mild or negative.  Dr. Gray recently denied her a prescription for morphine, describing her pain complaints as "diffuse".  He referred her to a psychiatrist.  Therefore, his opinion has been given less weight in this decision.

R. 21 (internal citation omitted).

The reasons articulated by the ALJ do not constitute good grounds for discounting Dr. Gray's opinion.[15]  Keith A. Gray, M.D. is a medical doctor.  R. 326, 327, 329.  330, 331, 335.  When a treating physician's opinion is not given controlling weight, the level of specialization is indeed one of several factors to consider.  *See* n.14, *supra*.  Nothing in the record, however, establishes whether Dr. Gray is a general practitioner; a family practice physician (e.g., who may specialize in musculoskeletal medicine); or a specialist in internal medicine.  Although his treatment notes show no board certifications, nothing in the record otherwise establishes his qualifications, training, or concentration with respect to musculoskeletal problems.  Nothing in the record establishes that any of his diagnoses or opinions — medical or psychiatric  — fall outside his qualifications.  Neither the ALJ nor the Commissioner cite any medical evidence that was inconsistent with Dr. Gray's opinion.

Lastly, Dr. Gray's refusal to prescribe morphine to a person who is also under the care of a pain management specialist and who might become dependent on powerful prescription

---

[15]Even the Commissioner is unable to offers any support for the ALJ's conclusion on this point.  Instead, the Commissioner's brief simply paraphrases the pertinent section of the ALJ's opinion.  Docket 14 at 12.

medication hardly justifies discounting his opinion.  Perhaps the ALJ thought the refusal indicated that Dr. Gray no longer believed Grimes was in significant pain as she claimed.  However, it seems that Dr. Gray wanted to compel Grimes to return to her pain management specialist, and his refusal to prescribe morphine was his method to accomplish this.  R. 326, 327.  Dr. Gray's opinions on the nature and severity of Grimes's physical and psychological impairments are well-supported by proper clinical examination, and are not inconsistent with the other substantial evidence in the record, so the ALJ must give them controlling weight.

The balance of Grimes's argument on this point, however, is misplaced.  Grimes argues that the ALJ weighed Dr. Gray's opinions against those of Dr. Prickett, a non-examining medical reviewer, is misplaced.  *See* Docket No. 13 at 20 - 21.  The ALJ, however, did not even refer Dr. Prickett's decision in explaining why he was discounting the opinion of Dr. Gray.  Grimes further argues that Dr. Prickett's opinion did not address the possibility that she suffered from a somatoform disorder, and therefore the opinions of Dr. Gray, Dr. Sheikh, and Dr. Ramsey were "uncontroverted on the issue of psychogenic pain and should have been afforded substantial weight by the ALJ."  Docket No. 13 at 21.  However, Grimes has not shown that any of the latter three opinions themselves addressed a somatoform disorder or psychogenic pain, much less that the ALJ discounted them due to a perceived conflict with the opinion of Dr. Prickett on those points.

-34-

## VI.   **CONCLUSION**

For the reasons stated above, this case is hereby **REMANDED** to the Commissioner of

Social Security under sentence four of 42 U.S.C. § 405 (g) for further review not inconsistent with

this decision.  On remand, the Commissioner should 1.)  develop a clear record as to Grimes's

mental disorders, mental RFC, and any resulting psychiatric limitations, giving appropriate weight

to the opinions of Grimes's treating physicians; and 2.) clearly articulate Grimes's psychiatric

limitations to the Vocational Expert in assessing whether the Commissioner has met her burden in

proving that Grimes can do other work.  The Clerk shall enter a judgment.

**DONE AND ORDERED** this 30th day of July, 2005.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL               33602

-35-

The Honorable James R. Ciaravino
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL          32817